YOUNG WOMEN'S CHRISTIAN ASSO-
CIATION OF PRINCETON, NEW
JERSEY et al., Plaintiffs,

v.

George F. KUGLER, Jr., Attorney Gen-
eral of the State of New Jersey,
Defendant.

Joanne ABRAMOWITZ, et al., Plaintiffs,

v.

George F. KUGLER, Jr., Attorney Gen-
eral of the State of New Jersey,
et al., Defendants.

Civ. A. Nos. 264–70, 431–70.

United States District Court,
D. New Jersey.

Feb. 29, 1972.

**1052**

No. 264–70:

Roy Lucas, New York City, and Richard I. Samuel, Newark, N. J., for plaintiffs.

George F. Kugler Jr., Atty. Gen. of New Jersey, by Barry H. Evenchick, Deputy Atty. Gen., for defendant.

No. 431–70:

Rita L. Murphy, Laura Jane Kahn, Jeffrey E. Fogel, Newark, N. J., for plaintiffs Hannah Borenstein, Gail Burt, Frances M. Catrambone, Emmillie Fox, Ursula Good, Mary Ann Hamilton, Margaret Holmes, Barbara Jackson, Marguerite Joralemon, Irene Montgomery, Joanne Noonan, Martha Paravati, Marilyn Speziale, Alberta Thomas, Betty Thomas, Deborah Tripp, Mercedes Valle, Mary Wright and Anna Marie Zangari.

Ann Marie Boylan, pro se.

Nadine Taub, Newark, N. J., for all other plaintiffs; Nancy Stearns, Newark, N. J., of counsel.

George F. Kugler, Jr., Atty. Gen. of New Jersey, by Barry H. Evenchick, Deputy Atty. Gen., for defendants George F. Kugler, Jr. and Lloyd W. McCorkle.

Lowenstein, Sandler, Brochin, Kohl & Fisher, Newark, N. J., for defendant Newark Beth Israel Medical Center.

Planned Parenthood Federation of America, Inc., by Hannoch, Weisman, Stern & Besser, Newark, N. J.; Greenbaum, Wolff & Ernst, New York City, of counsel, amici curiae in support of plaintiffs in No. 264–70.

New Jersey Right to Life Committee, Christian Action Foundation, New Jersey Catholic Conference, by Stephen J. Foley, Asbury Park, N. J., amici curiae in opposition in both cases.

Before FORMAN, Circuit Judge, and BARLOW and GARTH, District Judges.

## OPINION

FORMAN, Circuit Judge.

Two cases raising numerous constitutional challenges to the New Jersey abortion and related statutes are presented for disposition here. Plaintiffs in the first suit, Y.W.C.A. v. Kugler, No. 264–70 (Y.W.C.A.), are nine physicians, two of whose licenses have been revoked following prosecution under the challenged statutes; three women appearing for themselves and on behalf of the membership of the New Jersey Branch of the Women's International League for Peace and Freedom; and one woman appearing for herself and on behalf of the Young Women's Christian Association of Princeton, New Jersey. George F. Kugler, Jr., the Attorney General of the State of New Jersey, is named as defendant. Plaintiffs contend that N.J.S.A. 2A:87–1 [1] and 45:9–16 [2] deprive phy-

---

1. 2A:87–1 provides:

"Any person who, maliciously or without lawful justification, with intent to cause or procure the miscarriage of a pregnant woman, administers or prescribes or advises or directs her to take or swallow any poison, drug, medicine or noxious thing, or uses any instrument or means whatever, is guilty of a high misdemeanor.

"If as a consequence the woman or child shall die, the offender shall be punished by a fine of not more than $5,000, or by imprisonment for not more than 15 years, or both."

2. 45:9–16 provides, in pertinent part:

"The board [State Board of Medical Examiners] may refuse to grant or may suspend or revoke a license or the registration of a certificate or diploma to practice medicine and surgery or chiropractic filed in the office of any county clerk in this State under any act

sicians and women of constitutional rights guaranteed by the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments. Jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, 2201, 2202, 2281, 2284 and 42 U.S.C. § 1983.

Plaintiffs in the second suit, Abramowitz v. Kugler, No. 431-70 (Abramowitz), are approximately 1200 women, appearing for themselves and on behalf of all other New Jersey women similarly situated and allegedly suffering violations of their constitutional rights. In addition to the Attorney General of the State of New Jersey, plaintiffs name as defendants Lloyd W. McCorkle, Commissioner of Institutions and Agencies of the State of New Jersey, and Newark Beth Israel Medical Center.[3] Plaintiffs claim that N.J.S.A. 2A:87-1,[4] 2A:87-2,[5] 2A:170-76 [6] and 45:9-16 [7] violate the rights of women under the First, Fourth, Fifth, Ninth, Fourteenth and Nineteenth Amendments to the Constitution. Jurisdiction is invoked under the foregoing Amendments and

under 28 U.S.C. §§ 1331, 1343, 2201, 2202, 2281, 2284, 42 U.S.C. § 291 et seq. (the Hill-Burton Act), 42 U.S.C. § 1396 et seq. (Medicaid), and 42 U.S.C. § 1983.

A three-judge court was convened pursuant to 28 U.S.C. § 2284, in both cases, which were consolidated for purposes of a hearing and all further proceedings. Briefs were filed and oral arguments were presented. Plaintiffs seek summary judgment on requests for a declaratory judgment that the statutes respectively challenged are unconstitutional, and seek injunctions against their operation and enforcement. In addition, two of the plaintiff-physicians in *Y.W.C.A.* seek expungement of criminal records resulting from their convictions under the statute, and the return of their medical licenses, by order of this court.

Permission to appear as *amici curiae* was granted to the Planned Parenthood Federation of America, the New Jersey Right to Life Committee, the Christian Action Foundation and the New Jersey Catholic Conference, on all of whose behalf briefs were submitted.

of the Legislature, upon proof to the satisfaction of the board that the holder of such license . . . (c) has practiced criminal abortion, or been convicted of the crime of criminal abortion . . . or has pleaded nolo contendere, non vult contendere or non vult to an indictment, information, or complaint alleging the commission of the crime of criminal abortion . . . . Before any license, . . . shall be suspended or revoked, except in the case of convictions of criminal abortions. . . . the accused person shall be furnished with a copy of the complaint and be given a hearing . . . and any person whose license shall be suspended or revoked in accordance with this section shall be deemed an unlicensed person during the period of such suspension or revocation, and as such shall be subject to the penalties hereinafter prescribed for persons who practice medicine and surgery or chiropractic, without first having obtained a license so to do. . . ."

3. By stipulation of the parties, plaintiffs do not prosecute their action against defendant Newark Beth Israel Medical Center here.

4. See note 1 *supra.*

5. 2A:87-2 provides:

"Any person who causes or attempts to cause the miscarriage of a pregnant woman and the woman herself shall be a competent witness, and may be compelled to testify, but the testimony of such witness shall not be used in any prosecution, civil or criminal, against the person so testifying."

6. 2A:170-76 provides:

"Any person who, without just cause, utters or exposes to the view of another, or possesses with intent to utter or expose to the view of another, or to sell the same, any instrument, medicine or other thing, designed or purporting to be designed for the prevention of conception or the procuring of abortion, or who in any way advertises or aids in advertising the same, or in any manner, whether by recommendation for or against its use or otherwise, gives or causes to be given, or aids in giving any information how or where any such instrument, medicine or other thing may be had, seen, bought or sold, is a disorderly person."

7. See note 2 *supra.*

## I. STANDING

Defendants first contend that plaintiffs lack standing because they have not shown the existence of a case or controversy sufficient to invoke the jurisdiction of the court, and the issues raised are of a political and social, rather than a legal, nature and should properly be left to the state legislature for resolution.

Article III, sec. 2 of the Constitution, which limits judicially cognizable issues to those involving an actual "case" or "controversy," is the source of the standing requirement and, although outwardedly simple, reflects principles fundamental to the operation of our judicial system:

> "In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine." [8]

In addition, the standing requirement reflects a judicial rule of self-restraint, designed to avoid passing upon prematurely raised or ill-defined controversies involving constitutional questions.[9]

Since the passage of the Declaratory Judgments Act in 1934,[10] it has been said that the Act "intended to liberalize conceptions of justiciability".[11] It was not, however, intended to enlarge the jurisdiction of the courts,[12] and has in no way diminished the necessity of a party seeking a declaratory judgment to establish a case or controversy and thus, the standing requisite to the maintenance of a suit. This is manifest from the language of the statute itself [13] and from the Supreme Court's exposition of the prerequisites to a declaratory judgment:

> "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." [14]

Expressing these principles in another way, the Court has stated that:

> "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court

so largely depends for illumination of difficult constitutional questions.' Bak-

---

8. Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).

9. United Public Workers of America v. Mitchell, 330 U.S. 75, 90–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947) ; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

10. 28 U.S.C. § 2201.

11. Printing Plate Supply Co. v. Curtis Publishing Co., 278 F.Supp. 642, 645 (E.D. Pa.1968).

12. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 325, 56 S.Ct. 466, 80

L.Ed. 688 (1936) ; Kane v. Shulton, Inc., 189 F.Supp. 882, 884–885 (D.N.J.1960).

13. 28 U.S.C. § 2201 provides in pertinent part:
> "*In a case of actual controversy* within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought . . ." (Emphasis supplied.)

14. Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

er v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962)." [15] These principles have been reaffirmed in Golden v. Zwickler: [16]

"No federal court, whether this Court or a district court, has 'jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, *except as it is called upon to adjudge the legal rights of litigants in actual controversies.*' Liverpool, N. Y. & P. S. S. Co. v. Commissioners [of Immigration], 113 U.S. 33, 39 [5 S.Ct. 352, 355, 28 L.Ed. 899] (1885)." (Emphasis supplied).

■ Examining the allegations of plaintiff-physicians in *Y.W.C.A.* in light of these principles it is clear that they have fulfilled both constitutional and judicially formulated standing requirements. They allege that the abortion statute is vague on its face and as applied in violation of the specificity requirement of the Fourteenth Amendment; that it deprives physicians of the right to practice medicine according to the highest standard of medical practice, and that it violates the rights of physicians and their women patients to privacy in their physician-patient relationships, as guaranteed by the First, Fourth, Fifth, Ninth and Fourteenth Amendments.

As a result of prosecutions under the statute, two of the plaintiff-physicians have lost their licenses to practice medicine and one was incarcerated at the time this action was commenced. In addition, all allege that they have been forced to turn away patients seeking advice and information about the possibility of obtaining abortions.

In light of these circumstances, Tileston v. Ullman,[17] emphasized by defend-

ants to oppose standing, is clearly distinguishable. In *Tileston*, a physician challenged Connecticut's contraceptive statutes as violative of his patients' constitutional rights, but failed to allege any violation of his own personal or property rights. On the basis of these allegations it was held that no case or controversy existed as to him. In the present case, on the contrary, physicians have fully alleged past, present and continuing violations of their own liberties. Nor is this court persuaded by the reasoning applied in Doe v. Randall,[18] where the court held that no case or controversy had been presented by a physician who had performed an abortion, but against whom no indictment had been returned. The fact of prior prosecutions under the abortion statute, and the allegations of violations of plaintiff-physicians' own constitutional rights are sufficient to establish a *prima facie* case or controversy. Thus, the physicians clearly have standing.

■ Moreover, the violations of their constitutional rights alleged by plaintiff-physicians are closely interwoven with and inseparable from the allegations they make on behalf of their women patients for violations of their constitutional rights. The contention that the alleged rights to freely practice medicine according to the highest standard of medical practice, and to privacy in physician-patient relationships entitle physicians to advise and direct women patients concerning abortion, and to perform abortions, is inextricably linked with and dependent upon adjudication of the alleged right to privacy of their patients in securing abortions. Thus, it is appropriate here to grant plaintiff-physicians standing to litigate the alleged deprivations of the constitutional rights of their women patients.[19]

15. Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

16. 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

17. 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). *See* Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

18. 314 F.Supp. 32 (D.Minn.1970), aff'd, Hodgson v. Randall, 402 U.S. 967, 91 S.Ct. 1656, 29 L.Ed.2d 132 (1971).

19. Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Barrows v. Jackson, 346 U.S. 249, 257–258, 73 S.Ct. 1031, 97 L.Ed.

Plaintiffs numbering approximately 1200 in *Abramowitz* claim standing on the basis that they belong to, and appear on behalf of, the class of New Jersey women "who as women . . . suffer under the New Jersey abortion laws." In their complaint, as amended, brief and oral argument they assert that New Jersey women constitute the class most directly affected by the abortion statute, and that there is "no person with a greater personal stake in the question of the constitutionality of the New Jersey abortion statute than any fertile woman of child-bearing age." Plaintiffs argue that such a woman may *at any time* experience an unwanted or accidental pregnancy, in which case she will be forced either to bear an unwanted child or to risk the hazards of an illegal "back-street" abortion. Plaintiffs contend further that these consequences are forced upon women by operation of the statute, in violation of their constitutional rights to life and liberty and equal protection of the laws under the Fourteenth Amendment, and their right to privacy under the Ninth Amendment. They argue additionally that the effect of the statute in compelling them to bear unwanted children is to perpetuate an inferior status which the Nineteenth Amendment was intended to eradicate, and that the statute violates the proscription against an establishment of religion and the free exercise thereof under the First Amendment. Plaintiffs claim finally that the period of time available during pregnancy is insufficient for full litigation, and that, practically, they will be unable to redress deprivations of their constitutional rights without a grant of standing here.

■ It is apparent that the alleged deprivations of constitutional rights depend upon the contingency of pregnancy. It is only then that women must choose between bearing an unwanted

child and an abortion, and that the alleged constitutional deprivations take on immediacy and reality. However, aside from an allegation that women are compelled, under the present law, to subject their bodies to the possible dangers of oral and other contraceptives prior to pregnancy, plaintiffs have not shown a specific invasion of individual rights or threat of harm which arises prior to the occurrence of pregnancy. Nor do they allege that any of them is pregnant with an unwanted child or is seeking an abortion. Plaintiffs do allege that some of them have already been forced to choose between these two alternatives. But no plaintiff has shown that she is presently confronted with this problem.

While there may be a class of New Jersey women presently threatened as described by plaintiff-women, their contention that they are members thereof is unsupported by their complaint, as amended, their brief, or oral argument. We must conclude that the constitutional infirmities and deprivations alleged to flow from the statute are of a hypothetical and abstract nature as to these plaintiffs.

This conclusion is amply supported by prior adjudications involving the question of standing. In Flast v. Cohen,[20] upon which plaintiffs rely, the Court held that federal taxpayers possessed standing to litigate the constitutionality of allocations of federal funds to finance instruction in sectarian schools. The Court held that the plaintiff-taxpayers had shown an important personal stake in the outcome of the litigation, in the form of an immediate threat to their constitutional rights. It observed that the utilization of federal tax monies for such a purpose might well violate plaintiff-taxpayers' and all citizens' constitutional rights to be free of governmental establishment of religion. Thus a logical nexus existed between the violations al-

---

1586 (1953) ; Pierce v. Society of Sisters, 268 U.S. 510, 532–536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ; Truax v. Raich, 239 U.S. 33, 38–39, 36 S.Ct. 7, 60 L.Ed. 131 (1915).

20. 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

leged and the harm threatened to the plaintiffs in their status as federal taxpayers. In the present case we cannot find such a link between the alleged violations and the harm threatened to plaintiffs as women.

In Barrows v. Jackson,[21] money damages were sought against petitioner, a Caucasian, for breach of a racially restrictive covenant. Her claim of standing to litigate alleged violations of the constitutional rights of black citizens by state judicial enforcement of the covenant was upheld by the Court. It found, in addition to the threat of a substantial pecuniary loss, which was sufficient to confer standing, that "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court".[22] In the present case, as discussed above, plaintiff-physicians in *Y.W.C.A.* have standing to assert deprivations of the constitutional rights of their women patients. In fact, the complaint in *Y.W. C.A.* alleges most of the deprivations of the constitutional rights of women asserted by plaintiffs in *Abramowitz*. Hence, we are not faced with a factual situation in which it would be difficult, if not impossible, for the constitutional violations alleged to be adjudicated without a grant of standing to plaintiff-women. This is not one of the "unique situations" in which considerations of "broad constitutional policy" indicate a relaxation of the standing requirement.[23]

The circumstances of the present *Abramowitz* case, on the contrary, are more closely analogous to the facts involved in Zwickler v. Koota[24] and successive litigation in Golden v. Zwickler.[25] In the first case, the petitioner had been convicted of distributing anonymous political handbills inveighing against a congressman in violation of a New York State law, and sought a declaratory judgment that the statute was unconstitutional, stating his intention to distribute more handbills opposing him in the next election. A three-judge court abstained from determining whether the petitioner was entitled to a declaratory judgment. The Supreme Court reversed and remanded. Zwickler v. Koota, *supra*. Meanwhile, the congressman against whom petitioner's handbills were to be directed had left the Congress for a place on the Supreme Court of New York, which carried a term of fourteen years. The District Court held on remand that the lack of immediate threat to the petitioner of enforcement of the statute would not prevent it from issuing a declaratory judgment, and held the statute unconstitutional. On an appeal from this decision, the Court, in Golden v. Zwickler, *supra*, again reversed, holding that petitioner had not presented his constitutional question "in the context of a specific live grievance"[26] and that a hypothetical threat to his rights was insufficient to support a declaratory judgment.[27]

This reasoning is equally applicable to the situation of plaintiffs in *Abramowitz*. They do not possess standing to assert the claims of the class they purport to represent since no immediate threat exists which would indicate the presence of a case or controversy as to

21. 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

22. *Id.* at 257, 73 S.Ct. at 1035.

23. *Id.*

24. 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

25. 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

26. *Id.* at 110, 89 S.Ct. at 960.

27. In other three-judge district court cases attacking the constitutionality of state abortion statutes where standing was found, a substantially greater threat of injury to the plaintiffs existed. See Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill.1971), appeal docketed sub nom. Hanrahan v. Doe, No. 1522, and Heffernan v. Doe, No. 1523, 39 U.S.L.W. 3438 (April 6, 1971), renumbered No. 70–105 and No. 70–106 respectively, 40 U.S.L.W. 3007 (July 13, 1971) ; Roe v. Wade, 314 F. Supp. 1217 (N.D.Tex.1970), prob. juris. noted, 402 U.S. 941, 91 S.Ct. 1610, 29 L.Ed.2d 108 (1971) (No. 808, 1970 Term ; renumbered No. 70–18, 1971 Term).

them before this court. Moreover, this reasoning is likewise applicable to women plaintiffs in *Y.W.C.A.* The contentions of plaintiffs in *Abramowitz* and of those in *Y.W.C.A.*, as individual women and on behalf of the organizations they claim to represent amount to no more than allegations that they "feel inhibited"[28] by the operation of the abortion statute. Finding no distinction between them and absent a showing of a live controversy or immediate threat of injury, so much of the complaint as pertains to the allegations of the women-plaintiffs in *Y.W. C.A.*, individually, and allegedly on behalf of the Young Women's Christian Association of Princeton, New Jersey, and the New Jersey Branch of the Women's International League for Peace and Freedom[29] will be dismissed for lack of standing. On the same ground the complaint in *Abramowitz* must fall.[29a]

There remain the issues raised in the *Y.W.C.A.* complaint against the defendant Attorney General by the physician-plaintiffs for themselves, and on behalf of their women patients, to which the following discussion is addressed.

## II. ABSTENTION

 The Attorney General next urges that this court should abstain from entertaining plaintiffs' requests for declaratory and injunctive relief. In *Zwickler v. Koota*,[30] the Supreme Court expressed the broad general principle that Congress:

> "imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts, '. . . to guard, enforce, and protect every right granted or secured by the Constitution . . . .' "

Under the rule of *Zwickler* it has been held that a federal court may avoid its duty to accept federal constitutional claims only in "narrowly limited 'special circumstances.' "[31] One of these special circumstances is:

> "when a decision concerning a question of state law is necessary to a disposition of the case, and the answer to the state question involves unclear state law or a matter of paramount interest to the state."[32]

Foremost, however, is "the susceptibility of a state statute of a construction by the state courts that would avoid or modify the constitutional question."[33] The Attorney General contends that the present case falls within this exception and relies on *Reetz v. Bozanich*,[34] and *Rogers v. Danforth*.[35] They are, however, clearly distinguishable from the present case.

28. Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

29. No allegation or showing has been made that the women have been authorized to represent their respective organizations here.

29a. Crossen v. Breckenridge, 446 F.2d 833 (6 Cir. 1971); Doe v. Dunbar, 320 F. Supp. 1297 (D.Colo.1970).

30. 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967).

31. *Id.*

32. Gere v. Stanley, 453 F.2d 205, 208 (3 Cir. Dec. 27, 1971); Wisconsin v. Constantineau, 400 U.S. 433, 438, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Harman v.

Forssenius, 380 U.S. 528, 534–535, 85 S. Ct. 1177, 14 L.Ed.2d 50 (1965).

33. Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967); Askew v. Hargrave, 401 U.S. 476, 478, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971); Reetz v. Bozanich, 397 U.S. 82, 85–87, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Reid v. Board of Education, 453 F.2d 238 (2 Cir. Dec. 14, 1971).

34. 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970).

35. Civ. No. 18360–2 (W.D.Mo., Sept. 10, 1970); appeal docketed, 39 U.S.L.W. 3447 (April 13, 1971), (No. 1402, 1971 Term; renumbered No. 70–89, 1972 Term).

In *Reetz*, the Supreme Court held that a federal district court had erred in refusing to abstain from issuing a declaratory judgment where Alaska statutes regulating salmon licensing and attacked by plaintiffs had not yet been the subject of any adjudication in the state's courts. In *Rogers*, a federal district court abstained from hearing a challenge to Missouri's abortion statute on the grounds that the state court had not yet authoritatively construed the statute. In both cases, it was felt that state court adjudications might have avoided or resolved the issues raised in the federal district court. In the present case, on the contrary, the statute in question has been the subject of state judicial scrutiny, and the constitutional issues raised here have not been avoided or resolved by adjudication in the state courts. The Supreme Court of New Jersey has held the abortion statute susceptible of constitutional construction,[36] and it is in light of the New Jersey state adjudications that constitutional infirmities are alleged still to exist. The entertainment of this case, therefore, would not precipitate a premature federal disposition of constitutional questions which might be avoided or resolved in a state adjudication if this court abstained. Nor do the constitutional issues raised here involve any questions of unclear state law or an issue of paramount interest to the state, which should be resolved first in a state court. Thus, the "special circumstances" which demand abstention are lacking in the present case.[36a]

Although this conclusion would normally terminate our inquiry, the abstention question must be further examined in light of the issues raised by the Supreme Court in a group of six related cases, decided after the hearing in this case, which restricted the situations in which declaratory and injunctive relief against pending proceedings under a state criminal statute may be granted by a federal district court.[37] Younger v. Harris[38] was an appeal from the decision of a three-judge court of the Central District of California enjoining a prosecution pending under a state criminal statute, and, as "other and further relief," declaring the statute unconstitutional. This decision was reversed by the Supreme Court, which limited the grounds justifying federal injunctive relief to the "special circumstances" where a threat of great and immediate irreparable injury is shown.

More important to the prayer for declaratory relief in the present case, however, was the Court's overturning of the declaratory judgment in *Younger* on the basis of its holding in Samuels v. Mackell:[39]

"in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and . . . where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well."

It is clear that *Younger* and *Samuels* indicate a modification of the rule governing declaratory judgments stated in Zwickler v. Koota, *supra,* in cases where a prosecution under a state criminal statute is pending, and now restrict the criteria for federal declaratory relief to those justifying federal injunctive relief

36. See discussion at 23–27, *infra.*

36a. See Ryan v. Specter, 321 F.Supp. 1109 (E.D.Pa.1971).

37. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

38. 401 U.S. 37, 91 S.Ct 746, 27 L.Ed.2d 669 (1971).

39. 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971).

—that is, a threat of great and immediate irreparable damage.[40] The question left open by the Court is whether these principles should be applied to a case like the present, where no state criminal proceeding was pending when the declaratory judgment and the injunction against enforcement of the statute were sought.[41]

Examining the rationale underlying these decisions, it appears that the Court was strongly influenced by the disruptive effects of federal interference with *pending* state prosecutions. Federal intervention in such cases, which for all practical purposes results in parallel litigation of the same case in the two court systems, may seriously interrupt the smooth and efficient operation of both judicial systems. It will almost always interfere at least with state court proceedings since a federal district court can effectuate its declaratory judgments by enjoining the state proceedings. The effect of a declaratory judgment in these circumstances becomes virtually the same as that of an injunction, for either type of relief ultimately compels a halt in a state prosecution. Such a consequence in itself constitutes a severe blow to the delicate balance between the federal and state judicial systems and the principles of *comity which enforce and protect it.* Moreover, federal judicial interference in on-going state prosecutions may involve violations of the Federal Anti-Injunction statute,[42] in which the prohibition against federal judicial intervention in pending state proceedings has always been held to embody a basic principle in the separation of the state and federal judicial systems.

Upon a consideration of *Younger* and its related cases, however, we are not persuaded that the reasoning and fundamental policies voiced therein are applicable to the petition for declaratory judgment in the instant case, where no state prosecution was pending against the plaintiffs at the time federal relief was sought. Here, the consideration of a request for declaratory judgment does not constitute an adjudication of the plaintiffs' claims simultaneously in two judicial forums, and therefore does not involve the certain disruption of an on-going state proceeding with which the Supreme Court was concerned in *Younger* and the related cases. Thus, the entertainment of a petition for declaratory judgment in the circumstances of the present case is not analogous to injunctive relief and we are not persuaded that it must be governed by the limited "special circumstances" which justify the issuance of an injunction. Hence, we conclude that it is appropriate here to consider the plaintiffs' petition for declaratory relief.[43]

## III. INJUNCTION

Plaintiffs' request for injunctive relief, however, raises an abstention question of a different dimension. A line of decisions, of which *Younger* is but a recent example, reflect the established judicial principle that injunctions issued against pending or threatened prosecution under state criminal statutes severely threaten the integrity of orderly state judicial process, and the balance of the federal and state judicial systems. Hence, injunctive relief has

---

40. The other cases decided the same day, note 37 *supra*, illustrate the application of the principles set out in *Younger* and *Samuels.*

41. Indeed, the Court, in *Younger*, specifically observed:
 "(w)e express no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun." 401 U.S. at 41, 91 S.Ct. at 749.

42. 28 U.S.C. § 2283, which provides:

"A court of the United States may not grant an injunction *to stay proceedings* in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (Emphasis supplied.)

43. See Perez v. Ledesma, 401 U.S. 82, 98–130, 91 S.Ct. 674, 27 L.Ed.2d 701 (opinion of Justice Brennan, concurring in part and dissenting in part) ; Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed. 2d 196 (1971).

long been an extraordinary judicial measure appropriate only in "special circumstances." [44] In order to obtain injunctive relief a petitioner must show more than the threat of injury which is "incidental to every criminal proceeding brought lawfully and in good faith . . . ." [45] Rather, he must show a threat of great and immediate irreparable injury.[46]

In Dombrowski v. Pfister,[47] irreparable injury to the petitioners was established where state officials had utilized a statute in bad faith and for the purpose of harassment. The court found full support for the allegations that:

> "the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana." [48]

Finding that these threatened actions exerted a severe "chilling effect" upon the petitioners in the exercise of their First Amendment freedoms, and that "defense of the State's criminal prosecution [would] not assure adequate vindication of [petitioners'] constitutional rights," [49] the Court granted an injunction.

Subsequently, in Cameron v. Johnson,[50] the Court affirmed the refusal

of a federal district court to issue an injunction against enforcement of a state statute regulating picketing on the grounds that the statute was not vague and overbroad, and was not being utilized by the state in bad faith to discourage civil rights activities. It also stated that any chilling effect on picketing as a form of freedom of expression that might result from a good-faith enforcement of the statute was insufficient to justify injunctive relief. This reasoning was affirmed in *Younger*, in which the Court rejected the notion that "the federal courts may give equitable relief, without regard to any showing of bad faith or harassment, whenever a state statute is found 'on its face' to be vague or overly broad in violation of the First Amendment." [51]

Other courts facing challenges to state abortion laws have adjudicated requests for injunctions in accordance with these principles. In Babbitz v. McCann,[52] a federal district court held that Wisconsin's abortion statute violated the plaintiff's Ninth Amendment rights, but refused to issue an injunction against the stricken statute, stating that there was no showing of exceptional circumstances sufficient to warrant an injunction, and no reason to doubt that the state would fail to vindicate plaintiff's constitutional rights. Only when it became apparent that the state had refused to cease prosecutions under the statute did the district court issue an injunction against its exercise.[53] In Roe v. Wade,[54] a federal

44. Younger v. Harris, 401 U.S. 37, 43–49, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

45. Douglas v. City of Jeannette, 319 U.S. 157, 164, 63 S.Ct. 877, 881, 87 L.Ed. 1324 (1943).

46. *Id.*

47. 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed. 2d 22 (1965).

48. *Id.* at 482, 85 S.Ct. at 1118.

49. *Id.* at 485, 85 S.Ct. at 1120.

50. 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed. 2d 182 (1968).

51. 401 U.S. at 50, 91 S.Ct. at 753.

52. 310 F.Supp. 293 (E.D.Wis.1970), appeal dismissed, 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (1970).

53. Babbitz v. McCann, 320 F.Supp. 219 (E.D.Wis.1970). This injunctive judgment has been vacated and remanded by the Supreme Court, 402 U.S. 903, 91 S.Ct. 1375, 28 L.Ed.2d 643 (1971), for reconsideration in light of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). But see Kennan v. Nichol, 326 F.Supp. 613 (W.D.Wis.1971), aff'd, 404 U.S. 1055, 92 S.Ct. 735, 30 L.

district court held that an abortion statute of Texas violated the plaintiffs' Ninth Amendment rights, but refused to issue an injunction because it could not find that the statute was enforced in order to discourage protected activities, or to abridge freedom of expression.

■■ Applying these principles to the present case, it is clear that plaintiffs have neither alleged nor shown utilization of the New Jersey abortion statute by state prosecutors for any reason other than in good faith and for the purpose of securing valid convictions thereunder. They have made no allegation that the abortion statute has been used against them in bad faith as an instrument of intimidation or harassment in the exercise of their protected constitutional rights. The allegation that they are chilled in the exercise of First Amendment freedoms is insufficient in itself to support injunctive relief. Moreover, no reasons have been advanced to indicate that state prosecutors will fail to enforce or protect plaintiffs' constitutional rights as found by this court. Nor are we otherwise led to believe that they will under such circumstance ignore them. Hence, the special circumstances which justify the drastic relief of an injunction have not been shown.

## IV. VAGUENESS

Plaintiffs contend that the statutory provisions of 2A:87–1 [55] and 45:9–16 [56] are unconstitutionally vague, facially and as applied, because they provide insufficient warning to plaintiffs and others of the conditions which justify abortion, and are unevenly applied. 2A:87–1 provides as pertinent hereto:

"Any person who, maliciously or *without lawful justification,* with in-

tent to cause or procure the miscarriage of a pregnant woman, administers or prescribes or advises or directs her to take or swallow any poison, drug, medicine or noxious thing, or uses any instrument or means whatever, is guilty of a high misdemeanor." (Emphasis supplied.)

Plaintiffs specifically challenge the phrase "without lawful justification" as providing inadequate notice of the sphere of conduct prohibited by the statute.

■■ It is basic to due process that:

"(n)o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids. (footnote omitted) '. . . a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " [57]

Nowhere in 2A:87–1 or any legislative history, however, is there a hint of what reasons may constitute "lawful justification" for the termination of pregnancy. "Lawful" is defined in Black's Law Dictionary as: "Legal; warranted or authorized by the law; having the qualifications prescribed by law; not contrary to nor forbidden by the law." "Justification" is defined as "maintaining or showing a sufficient reason in court why the defendant did what he is called upon to answer . . . . Just cause or excuse . . . . Just, lawful excuse for act . . . . Reasonable excuse." These definitions do not clarify the statute. Nor do the defendants urge

Ed.2d 727 (1972), in which a temporary restraining order issued by a single federal district court judge against threatened prosecution under the stricken statute was upheld by the Supreme Court.

54. 314 F.Supp. 1217 (N.D.Tex.1970), prob. juris. noted, 402 U.S. 941, 91 S.Ct. 1610, 29 L.Ed.2d 108 (1971), (No. 808, 1970 Term; renumbered No. 70–18, 1971 Term).

55. *See* note 1 *supra.*

56. *See* note 2 *supra.*

57. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939); Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

that the language of the statute itself fulfills the specificity requirement of the Fourteenth Amendment to give reasonable notice of the scope of permissible or prohibited activity. They argue rather that the challenged language, which has remained virtually unaltered since the passage of the statute in 1849, was intentionally retained to provide for continuing judicial interpretation in the light of prevailing conditions and that the New Jersey courts have interpreted the statute so as to eliminate potential vagueness in its scope. Defendants rely additionally upon guidelines formulated by a Committee of County Prosecutors and issued by the Office of the Attorney General in 1967 construing the scope of the phrase "without lawful justification." All County Prosecutors in New Jersey, save for one,[58] agreed to be bound thereby.

Finally, defendants urge that the present case does not involve a statute which restricts freedom of expression, and is not deserving of the strict judicial scrutiny called for where a chilling effect on First Amendment freedoms may exist.[59]

At the outset, we must reject this last contention. First Amendment freedoms of speech and expression are clearly involved in the present case since the very language of the statute imposes a prohibition on any person who "prescribes or advises or directs" a woman to terminate her pregnancy. New Jersey courts have in fact upheld convictions of individuals under the statute who imparted information concerning the procurement of abortions.[60]

We are not persuaded by the contention that the sweeping language of the statute can be upheld as an expression of legislative intent to place interpretations of the phrase "without lawful justification" in the courts. While the legislature may validly leave the task of determining the scope and contours of broadly worded statutes to the judiciary, which is bound to uphold its constitutionality if at all possible, this is hardly susceptible of accomplishment when the intent or purpose of the statute is left obscure.[61] It is patent, indeed, that the New Jersey Legislature has left undetermined whether the statute was intended as a health and safety measure for the protection of women, as a protection for the lives of unborn children, or both.[62]

We turn now to the decisions of the New Jersey courts to determine whether, as defendants urge, there have been judicial interpretations construing the statute to sufficiently forewarn the plaintiffs of the sphere of activity prohibited by its language. The first New Jersey case involving judicial comment on the phrase "without lawful justification" was State v. Brandenburg.[63] Following his conviction under the statute in that case, the defendant-physician on appeal challenged *inter alia* a charge to the jury at trial that:

> " 'Lawful justification is used in the sense of necessity. It is a defense that the destruction of the child's life was

**58.** The Prosecutor of Middlesex County declined to adhere to the Report.

**59.** N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); see Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

**60.** State v. Ellrich, 10 N.J. 146, 89 A.2d 685 (1952); State v. Murphy, 27 N.J.L. 112 (Sup.Ct.1858).

**61.** In fact, shadows have been cast upon the adequacy of legislative directives and guidelines for judicial interpretation of this statute. *See* opinions of Chief Justice Weintraub in State v. Moretti, 52 N.J. 182, 195, 244 A.2d 499 (1968) (concurring); State v. Baird, 50 N.J. 376, 382–383, 235 A.2d 673 (1967) (concurring); Gleitman v. Cosgrove, 49 N.J. 22, 57–58, 227 A.2d 689 (1967) (dissenting in part); and the opinion of Justice Francis in Gleitman v. Cosgrove, *supra*, at 40, 48, 227 A.2d 689 (concurring).

**62.** *See* Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967); State v. Gedicke, 43 N.J.L. 86 (Sup.Ct.1881); State v. Murphy, 27 N.J.L. 112 (Sup.Ct.1858).

**63.** 137 N.J.L. 124, 58 A.2d 709 (Sup.Ct. 1948).

necessary to save that of the mother, but it should be remembered that necessity of this class must be strictly limited. The right can only be exercised in extremity.' "[64]

The appellant argued that the trial court should have charged that protection of a woman's health and well-being constitute lawful justification under the statute. The appellate court held that there was no error in the charge, particularly since the defense at trial had been that the abortion was necessary to save the mother's life. It declined to consider whether the protection of the mother's health constituted lawful justification, but did reject the proposition that "so broad a ground as 'well-being' may be considered by a jury as ground for causing a miscarriage."[65]

Judicial consideration of the inclusive sweep of the challenged statutory language occurred again in Gleitman v. Cosgrove.[66] Although this was a malpractice action against two physicians who allegedly failed to apprise the mother that birth defects might result from rubella, it became a vehicle for the expression of considerably diverse judicial opinion on what reasons "lawfully" justify abortion. The New Jersey Supreme Court refused to reach the question of whether an abortion, if sought, would have been illegal, but went on to state that:

> "The only justification so far held lawful by our courts is preservation of the mother's life. State v. Shapiro, 89 N.J.L. 319, 98 A. 437 (E & A 1916); State v. Brandenburg, 137 N.J.L. 124, 58 A.2d 709 (Sup.Ct.1948). It may well be that when a physician performs an abortion because of a good faith determination in accordance with accepted medical standards that an abortion is medically indicated, the physician has acted with lawful justification within the meaning of our statute and has not committed a crime."[67]

Notwithstanding the court's express refusal to consider whether an abortion, if sought, would have been lawfully justified, the significance of the language cannot be ignored. For it not only approved the ground of necessity to preserve the mother's life as a lawful justification for abortion, but also clearly implied that medical indications as well might justify it. Such judicial expression, whether a holding or merely *dicta,* surely did not serve to illuminate the reasons which constitute lawful justification under the statute, either in performing abortions or imparting knowledge thereof. Chief Justice Weintraub, commenting on the above-quoted statement, observed that:

> "the very suggestion that a question remains as to whether a eugenic abortion is criminal will be quite as forbidding as a flat holding that it is."[68]

At the very least, the language of the court in *Gleitman* implied an opportunity for physicians to utilize their medical judgment in granting abortions, but left wide open the possibility that they could be second-guessed in a judicial forum, to incur the severe penalties of conviction and loss of license.

In the same year that *Gleitman* was decided, guidelines were formulated by the County Prosecutors, interpreting the statutory phrase "without lawful justification" as heretofore noted.[69] They virtually adopted the language of the court in *Gleitman,* stating that abortions would be considered lawfully justified when necessary to preserve the mother's life, or when performed on a good faith determination made in accordance with accepted medical standards that a termination of pregnancy was medically indicated. It is apparent that the Prosecutors relied on the language of the *Gleitman* case as a determinative interpretation of the statute.

---

64. *Id.* at 126, 58 A.2d at 710.

65. *Id.* at 127, 58 A.2d at 710.

66. 49 N.J. 22, 227 A.2d 689 (1967).

67. *Id.* at 31, 227 A.2d at 694.

68. *Id.* at 56 (dissenting in part), 227 A.2d at 707.

69. *See* p. 22, *supra.*

Neither the statement of the court in *Gleitman* nor the County Prosecutors' guidelines were further clarified in the New Jersey Supreme Court's recent consideration of State v. Moretti.[70] On that appeal from a conviction of conspiracy to commit an unlawful abortion, the court replied to the appellants' contention that the statute was unconstitutionally vague by stating that:

"Clearly, a construction of the statute which confined the meaning of the phrase 'lawful justification' to the preservation of the mother's life would avoid any constitutional attack based on vagueness." [71]

It also stated that:

"(i)t is beyond comprehension that the defendants could have believed that our abortion statute envisioned lawful justification to exist whenever a woman wanted to avoid having a child." [72]

The court did not in any way allude to its language in *Gleitman,* adopted by the Prosecutors of New Jersey, that an abortion may be lawfully justified if medically indicated on the basis of a good faith determination made in accordance with accepted medical standards. Whether the court intended thereby to affirm or reject its earlier language is unclear. Yet the Prosecutors have given no indication of their withdrawal from their position in the 1967 report, despite the more restrictive language in *Moretti.* In fact, several justices of the New Jersey Supreme Court have voiced widely differing opinions regarding the scope of reasons which would lawfully justify abortion under the statute. Justice Francis, concurring in *Gleitman,* argued that necessity to preserve the mother's life is the only lawful justification under the statute, while Chief Justice Weintraub (dissenting in part) and Justice Jacobs (dissenting) stated their belief that rubella provides a lawful justification for the termination of pregnancy. Justice Jacobs additionally noted that ter-mination of pregnancy to preserve the mother's life or health should be considered lawful justification in his observation that:

"it is well-known that abortions have been and are being performed in good faith by highly qualified physicians in highly reputable hospitals, when necessary to preserve the life *or health* of the mother, or to preclude the quickening of the fetus *in rubella cases and the like.*" (Emphasis supplied.) [73]

On the basis of the foregoing discussion it is clear that the defendant has accurately argued that abortion is lawfully justified at least when necessary to preserve the mother's life; that it "may well be" justified when performed on a good faith determination that accepted medical standards so indicate; and that most New Jersey prosecutors appear to be operating under the assumption that both reasons constitute lawful justification for abortion. This is a frail foundation, however, for the defendant's contention that the statute has thereby been rendered sufficiently specific to conform to the stringent requirements of the Fourteenth Amendment for adequate and reasonable notice of the sphere of activity prohibited by it. All of these arguments serve only to emphasize the absence of judicial interpretation establishing a clear standard by which individuals and prosecutors alike may reasonably determine the lawfulness of conduct under the statute. We are not persuaded that the decisions of the New Jersey courts have provided constitutionally adequate forewarning of the sphere of activity prohibited by the statute as being "without lawful justification." We cannot find proper notice in the language of the statute or in any legislative expression of intent or purpose. Nor can a mere statement of policy issued by the state prosecutors provide the necessary specificity.

70. 52 N.J. 182, 244 A.2d 499 (1968).

71. *Id.* at 191, 244 A.2d at 504.

72. *Id.* at 194, 244 A.2d at 505.

73. Gleitman v. Cosgrove, 49 N.J. 22, 52–53, 227 A.2d 689 (1967) ; Sanitary Vendors, Inc. v. Byrne, 72 N.J.Super. 276, 287, 178 A.2d 259 (1962).

The New Jersey statute is unlike that of the District of Columbia which was upheld by the Supreme Court on a challenge of vagueness in United States v. Vuitch.[74] The Court there held constitutional a statute prohibiting abortion unless "necessary for the preservation of the mother's life or health," finding that the words "life or health" were sufficiently specific to fulfill the notice requirements of the Fourteenth Amendment. The New Jersey statute is not similar to that statute, either in language or as interpreted by the state courts.

In the absence of judicial interpretation and legislative history or directives providing adequate guidelines for the conduct of those who may be threatened with possible prosecution under 2A:87–1, it cannot be constitutionally sustained. The challenged phrase "without lawful justification" provides not a glimmer of notice to the reader of what he may and may not do.

In the final analysis, plaintiff-physicians who may be threatened with prosecution under the abortion statute can rely only upon their individual judgment, always subject to a judicial determination that they guessed wrongly, and to resulting conviction and loss of license to practice medicine.[74a] As Justice Clark has observed:

"The increasing number of abortions subjects physicians to increased dangers of liability for incorrectly interpreting a statute. It appears that doctors face an uncertain fate when performing an abortion." [75]

We conclude that the New Jersey abortion statute, 2A:87–1, is unconstitutionally vague on its face and as applied;

that it chills and deters the plaintiff-physicians in the exercise of protected First Amendment activities; and that it violates plaintiff-physicians' rights under the Fourteenth Amendment to freely practice the profession of their choice.

## V. RIGHT OF PRIVACY

Plaintiff-physicians further contend that the New Jersey abortion statutes, 2A:87–1 and 45:9–16, violate their and their patients' rights of privacy in the physician-patient relationship as guaranteed by the First, Fourth, Fifth, Ninth and Fourteenth Amendments. They urge that a statutory command to withhold medical advice or services to women seeking abortions intrudes unconstitutionally upon an alleged right of women to privacy in determining whether to bear a child, which includes a right "not to have children in the cases where pregnancy can be terminated in its early stages by means of an induced or therapeutic abortion." [76] It is argued that this right of privacy extends to the quickening period, including at least the first trimester of pregnancy. If women patients are entitled to seek the services of physicians to perform abortions, it follows that the rendition of such services is beyond the reach of the abortion law.

The right of privacy alleged here is grounded upon the fundamental principle that the Constitution protects the right of an individual to control the use and function of his or her body without unreasonable interference from the state. Plaintiffs do not rely on the literal language of any constitutional provision to support their allegations. Rather, they contend that a number of

74. 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971).

74a. See opinion of Justice Douglas in United States v. Vuitch in which he stated: "Unless the statutory code of conduct is stable and in very narrow bounds, juries have a wide range and physicians have no reliable guideposts. The words . . . [of the statutory code] . . .

become free-wheeling concepts, too easily taking on meaning from the juror's predilections or religious prejudices." 402 U.S. at 80, 91 S.Ct. at 1303 (dissenting in part).

75. Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola L. Rev. 1, 7 (1969).

76. Brief for Plaintiff at 62.

Supreme Court decisions, considered together, have interpreted the Ninth and Fourteenth Amendments,[77] either singly or in combination, to encompass the right of privacy asserted here.

A foundation for this principle may be observed in Union Pacific Railway Co. v. Botsford,[78] in which the Court stated:

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

The continuing validity of this principle was demonstrated only four years ago in Terry v. Ohio,[79] wherein the Supreme Court specifically reaffirmed the above-quoted passage from Botsford.[80]

Since that time, the Supreme Court has expanded the Botsford principle, interpreting the Ninth and Fourteenth Amendments as having established that the Constitution protects certain rights relating to marriage, sex, childbearing, childrearing and education, despite the fact that such rights are not mentioned either in its body or in any of its Amendments.

The first of this line of cases is Meyer v. Nebraska.[81] In Meyer, the Court struck down, on Fourteenth Amendment grounds, a state statute which sought to support the primacy of the English language by prohibiting the teaching of modern foreign languages to school children below the eighth grade. In discussing the applicability of the Fourteenth Amendment to the issue before it, the Court commented:

"The problem for our determination is whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment. 'No State shall . . . deprive any person of life, liberty, or property, without due process of law.'

"While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right . . . to contract, to engage in any of the common occupations of life, to acquire

---

77. The Ninth Amendment provides:
"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."
The Fourteenth Amendment provides, in pertinent part:
" . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

78. 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891).

79. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

80. Botsford was a negligence action which posed the question of a federal court's authority to order a plaintiff to submit to a physical examination prior to trial. The Supreme Court held that the federal courts lacked such power in the absence of congressional authority. It might be argued that little reliance should be placed upon the principle extracted from Botsford since 1) it evolved from, and should be limited to, a tort context, and 2) the adoption of the Federal Rules of Civil Procedure robbed the ultimate holding of the case of any effect. See Sibbach v. Wilson & Co., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941).
Such an argument is not persuasive, however, in light of the reaffirmance of the Botsford principle by the Terry Court. Terry involved the propriety of a stop-and-frisk search of an individual conducted by a policeman whose suspicions had been aroused. The recent restatement of the Botsford principle in the context of a Fourth Amendment case clearly establishes that the principle is very much alive and is not limited to tort actions.

81. 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. [citations omitted] The established doctorine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect . . .." [82]

Two years later, in Pierce v. Society of Sisters,[83] the Supreme Court, citing its decision in *Meyer, supra,* read the Fourteenth Amendment as guaranteeing the "liberty of parents and guardians to direct the upbringing and education of children under their control" [84] and vindicated the right of private school attendance despite a state law requiring that students be educated in public schools. In Skinner v. Oklahoma ex rel. Williamson,[85] which involved a challenge to an Oklahoma law requiring compulsory sexual sterilization for habitual criminal offenders, a unanimous Court voided the statute for violating the Equal Protection Clause of the Fourteenth Amendment. In so doing, however, the Court addressed itself directly to a "right which is basic to the perpetuation of a race—the right to have offspring." [86] More recently, in Loving v. Virginia,[87] the Court noted that "(t)he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men," and held that a state anti-miscegenation law violated the Due Process Clause of the Fourteenth Amendment by unreasonably interfering with marriage, "one of the 'basic civil rights of man,' fundamental to our very existence and survival." [88]

The existence of a right of privacy received significant support in Griswold v. Connecticut.[89] That case resulted from a Connecticut statute which made it a criminal offense for any person either to use or to aid or abet in the use of any drug, medicinal article or instrument for the purpose of preventing conception. The appellants in *Griswold,* respectively the Executive Director and the Medical Director, a physician, of the Planned Parenthood League of Connecticut, provided advice, information and devices to married couples for contraceptive purposes. Their convictions for engaging in the prohibited activities as accessories were upheld by the Connecticut courts. The Supreme Court held the Connecticut statutes unconstitutional as an unreasonable interference with the right of marital privacy. Justice Douglas, for the majority, recognized that the right of marital privacy upon which he rested his opinion is not stated specifically in the Constitution and explained his reasoning in the following language:

"The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. See Poe v. Ullman, 367 U.S. 497, 516–522 [81 S.Ct. 1752, 6 L.Ed.2d 989] (dissenting opinion). Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one, as we have seen. The Third Amendment in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms

---

82. *Id.* at 399–400, 43 S.Ct. at 626–627.

83. 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

84. *Id.* at 534–535, 45 S.Ct. at 573.

85. 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

86. *Id.* at 536, 62 S.Ct. at 1111.

87. 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

88. *Id.* at 12, 87 S.Ct. at 1824.

89. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965).

the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'

\* \* \* \* \* \*

"We have had many controversies over these penumbral rights of 'privacy and repose.' See, e. g., Breard v. Alexandria, 341 U.S. 622, 626, 644 [71 S.Ct. 920, 923, 933, 95 L.Ed. 1233]; Public Utilities Comm'n v. Pollak, 343 U.S. 451 [72 S.Ct. 813, 96 L.Ed. 1068]; Monroe v. Pape, 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492]; Lanza v. New York, 370 U.S. 139 [82 S.Ct. 1218, 8 L.Ed.2d 384]; Frank v. Maryland, 359 U.S. 360 [79 S.Ct. 804, 3 L.Ed.2d 877]; Skinner v. Oklahoma, 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655]. These cases bear witness that the right of privacy which presses for recognition here is a legitimate one.

"The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." [90]

Notable is the critical significance of Justice Douglas' citation of the Ninth Amendment in his listing of constitutional provisions which mark out rights or zones of privacy through their penumbras and emanations.[91]

The concurring opinion of Justice Goldberg [92] sought to explore and elucidate the right of privacy emanating from the Ninth Amendment. As a starting point in his analysis, Justice Goldberg stated:

"This Court, in a series of decisions, has held that the Fourteenth Amendment absorbs and applies to the States those specifics of the first eight amendments which express fundamental personal rights. [footnote omitted] The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments." [93]

He then proceeded to determine whether the Ninth Amendment was properly invoked in considering the question of a right of privacy, reasoning that:

"While this Court has had little occasion to interpret the Ninth Amendment, [footnote omitted], '[i]t cannot be presumed that any clause in the constitution is intended to be without effect.' Marbury v. Madison, 1 Cranch 137, 174 [2 L.Ed. 60]. In interpreting the Constitution, 'real effect should be given to all the words it uses.' Myers v. United States, 272 U.S. 52, 151 [47 S.Ct. 21, 31, 71 L.Ed. 160]. The Ninth Amendment to the Consti-

---

90. Id. at 484–485, 85 S.Ct. at 1681.

91. The *Griswold* decision itself demonstrates the evolution and maturation of the constitutional principles relating to privacy and due process. Four years prior to *Griswold*, the same Connecticut statutes were challenged on identical constitutional grounds in Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). The distinguishing factor between the two cases was that *Griswold* involved a review of a state criminal conviction, whereas *Poe* reached the Court on a complaint seeking declaratory relief based upon potential state prosecution.

The *Poe* majority found the declaratory judgment issue non-justiciable. However, it is interesting to note that Justices Douglas and Harlan dissented in *Poe* and discussed the merits of the constitutional claims urged by plaintiffs. In their dissents can be viewed the developing theories of privacy and due process which later formed the basis for the resolution of *Griswold*.

92. Justice Goldberg wrote for himself, Chief Justice Warren and Justice Brennan.

93. 381 U.S. at 488, 85 S.Ct. at 1683.

tution may be regarded by some as a recent discovery and may be forgotten by others, but since 1791 it has been a basic part of the Constitution which we are sworn to uphold. To hold that a right so basic and fundamental and so deep-rooted in our society as the right of privacy in marriage may be infringed because that right is not guaranteed in so many words by the first eight amendments to the Constitution is to ignore the Ninth Amendment and to give it no effect whatsoever. Moreover, a judicial construction that this fundamental right is not protected by the Constitution because it is not mentioned in explicit terms by one of the first eight amendments or elsewhere in the Constitution would violate the Ninth Amendment, which specifically states that '[t]he enumeration in the Constitution, of certain rights, shall not be *construed* to deny or disparage others retained by the people.' " (Emphasis in original)[94]

In determining which rights are protected against unreasonable state intervention and interference by the Ninth Amendment, Justice Goldberg stated:

"In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather, they must look to the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so rooted [there] . . . as to be ranked as fundamental.' Snyder v. Massachusetts, 291 U.S. 97, 105 [54 S.Ct. 330, 332]. The inquiry is whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." . . .' Powell v. Alabama, 287 U.S. 45, 67 [53 S.Ct. 55, 77 L.Ed. 158]." [95]

The late Justice Harlan concurred in the *Griswold* decision but not in the opinion of the Court. He stated:

"In my view, the proper constitutional inquiry in this case is whether this Connecticut statute infringes the Due Process Clause of the Fourteenth Amendment because the enactment violates basic values 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288]. For reasons stated at length in my dissenting opinion in Poe v. Ullman, *supra* [367 U.S. 497, 539–555, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)], I believe that it does. While the relevant inquiry may be aided by resort to one or more of the provisions of the Bill of Rights, it is not dependent on them or any of their radiations. The Due Process Clause of the Fourteenth Amendment stands, in my opinion, on its own bottom." [96]

According to Justice Harlan, Fourteenth Amendment analysis proceeds as follows:

"Each new claim to Constitutional protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed. Though we exercise limited and sharply restrained judgment, yet there is no 'mechanical yardstick,' no 'mechanical answer.' The decision of an apparently novel claim must depend on grounds which follow closely on well-accepted principles and criteria. The new decision must take 'its place in relation to what went before and further [cut] a channel for what is to come.' Irvine v. California, 347 U.S. 128, 147 [74 S.Ct. 381, 391, 98 L.Ed. 561] (dissenting opinion)."[97]

 Hence *Griswold* and its associated cases establish the following

---

94. *Id.* at 490–492, 85 S.Ct. at 1685.

95. *Id.* at 493, 85 S.Ct. at 1686.

96. 381 U.S. at 500, 85 S.Ct. at 1690.

97. Poe v. Ullman, 367 U.S. 497, 544, 81 S.Ct. 1752, 1777 (1961) (dissenting).

basic principles applicable to the issues presented here:

1. Not all fundamental rights guaranteed by the United States Constitution are mentioned specifically either in its body or in its amendments;

2. A general right of privacy, or a collection of particular zones of privacy, exists in the Constitution, whether derived from the penumbras and emanations of various constitutional provisions or amendments, the Ninth Amendment, the Due Process Clause of the Fourteenth Amendment or a combination thereof;

3. In determining which activities deserve constitutional protection, only those that can be termed "fundamental" or "implicit in the concept of ordered liberty" are subsumed under a right or zone of privacy;

4. The constitutional right or zone of privacy has been held to include and protect at least certain activities relating to marriage, sex, contraception, procreation, child-rearing and education; and

5. Even if an activity is sufficiently basic to be included within a right of privacy, it is not entitled to freedom from all regulation and control by government.

Applying these principles to the circumstances of the present case, the absence of specific language in the Constitution does not dilute or diminish the contention that there is a right of privacy which includes the right to seek an abortion in the early stages of pregnancy. The scope of interests found to be constitutionally protected by the Supreme Court demonstrates that it views both the sanctity of the individual's person and his relationships within a family as so vital to our free society that they should be ranked as fundamental, or implicit in the concept of ordered liberty. Supreme Court decisions heretofore examined have determined that the individual's person and his freedom to marry, to enjoy privacy in a marriage, to have offspring, to decide not to have offspring by practicing contraception, and to control and direct the education of children, are protected from unreasonable governmental interference.

In the wake of *Griswold* there have been a number of lower court decisions directed to the merits of the right of privacy contentions which have expanded the scope of those protected activities to include a woman's right to choose whether to complete a pregnancy and bear a child.

In California v. Belous,[98] the court stated:

"The fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgement of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex. [citing *Griswold, Loving, Skinner, Pierce, Meyer,* and two California cases] That such a right is not enumerated in either the United States or California Constitutions is no impediment to the existence of the right. [citations omitted]."

The court in Babbitz v. McCann,[99] found the Ninth Amendment of the Constitution protects a "woman's inherently personal right" to obtain an abortion after analyzing a host of authority, including *Belous, Botsford, Griswold, Loving, Meyer, Pierce* and *Skinner*.

In Roe v. Wade,[100] the court struck down the Texas abortion statute as infringing upon "plaintiffs' fundamental right to choose whether to have children," citing *Babbitz, Belous, Griswold,* all *supra*, and State v. Munson.[101]

98. 71 Cal.2d 954, 80 Cal.Rptr. 354, 359–360, 458 P.2d 194, 199–200 (1969).

99. 310 F.Supp. 293, 301 (E.D.Wis.1970), appeal dismissed, 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (1970).

100. 314 F.Supp. 1217, 1222 (N.D.Tex. 1970), prob. juris. noted, 402 U.S. 941,

91 S.Ct. 1610, 29 L.Ed.2d 108 (1971). (No. 808, 1970 Term; renumbered No. 70–18, 1971 Term).

101. Memorandum decision (S.Dak.Cir.Ct., Pennington County, April 6, 1970).

In Doe v. Scott,[102] the court reviewed the authorities discussed above and concluded:

"We cannot distinguish the interests asserted by the plaintiffs in this case from those asserted in *Griswold* . . . We believe that *Griswold* and related cases establish that matters pertaining to procreation, as well as to marriage, the family, and sex are surrounded by a zone of privacy which protects activities concerning such matters from unjustified governmental intrusion." [103]

Accordingly, we are persuaded that the freedom to determine whether to bear a child and to terminate a pregnancy in its early stages is so significantly related to the fundamental individual and family rights already found to exist in the Constitution that it follows directly in their channel and requires recognition.[104] Whether a constitutional right of privacy in this area is conceptualized as a family right, as in *Griswold*, as a personal and individual right, or as deriving from both sources is of no significance and applies equally to all women regardless of marital status, for the restriction on abortion by the New Jersey statutes immediately involves and interferes with the protected areas of both family and individual freedom.

Hence, we hold that a woman has a constitutional right of privacy cognizable under the Ninth and Fourteenth Amendments to determine for herself whether to bear a child or to terminate a pregnancy in its early stages, free from unreasonable interference by the State.

There remains a question of the extent of authority of the state to regulate in this area. While it has long been recognized that constitutional rights are not immune from all governmental regulation,[105] it is insufficient for the state to demonstrate that a restrictive regulatory scheme is motivated merely by some rational purpose. State intrusions into an area of constitutionally protected freedom must be founded on a compelling state interest which overrides the private rights of the individual.[106] Here, as in California v. Belous: [107]

"The critical issue is not whether such rights exist, but whether the state

102. 321 F.Supp. 1385 (N.D.Ill.1971), appeal docketed sub nom. Hanrahan v. Doe, No. 1522, and Heffernan v. Doe, No. 1523, 39 U.S.L.W. 3438 (April 6, 1971), renumbered No. 70–105 and No. 70–106 respectively, 40 U.S.L.W. 3007 (July 13, 1971).

103. 321 F.Supp. at 1389–1390.

104. *See* Editorial, Anti-Abortion Laws— As to Their Legality and Morality, 95 N.J. Law J. 4 (Jan. 13, 1971).

For the major cases finding no right of privacy, *see* Corkey v. Edwards, 322 F. Supp. 1248 (W.D.N.C.1971); Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970); and Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D.La.1970), appeal docketed, 39 U.S.L.W. 3247 (Dec. 8, 1970), (No. 1010, 1970 Term; renumbered No. 70–42, 1971 Term).

105. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). *See* New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

106. As Justice Goldberg stated in his concurring opinion in *Griswold*:
"In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.' Bates v. Little Rock, 361 U.S. 516, 524 [80 S.Ct. 412, 417, 4 L.Ed.2d 480]. The law must be shown 'necessary, and not merely rationally related, to the accomplishment of a permissible state policy.' [citations omitted]." 381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510.
*See* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

107. 71 Cal.2d 954, 80 Cal.Rptr. 354, 360, 458 P.2d 194, 200 (1969).

has a compelling interest in the regulation of a subject which is within the police powers of the state . . . ."

■ Where such an interest exists, state regulation must be narrowly drawn, and reasonably designed to fulfill its purpose without encroaching unnecessarily upon personal liberty. As was said in N. A. A. C. P. v. Alabama:[108]

"a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. [citation omitted] ' . . . [T]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.' Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213. ' . . . [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' Shelton v. Tucker, 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231]."

The Attorney General and *amici*, supported by briefs and oral argument, defend the statutory restrictions provided in the New Jersey abortion laws on two grounds of purported state interest: the power of the State to regulate conduct inimical to the general welfare, and the concept of the protection of the embryo or fetus. Inevitably there are drawn into issue other areas of conceivable state interest, such as guarding the health and safety of women, the control of sexual behavior, and the promotion of increased population.

■ There is no question that the State has a rational and compelling interest in safeguarding the health, safety, and lives of its citizens.

■ Concerning the relatively abstract interest of the State as expressed by the Attorney General in regulating conduct inimical to the general welfare, no authority has been advanced nor any found indicating that a state may sustain legislation alleged to infringe on individual constitutional rights for so amorphous a reason as fostering the general welfare of its citizens. It is clear that the State must show some particular and specific interest which is compelling.

Legislative concern for the lives and health of women was a motivation in the passage of the 1849 abortion statute, which has been altered but little to date. In State v. Cooper [109] the court held that:

"the procuring of an abortion by the mother, or by another with her assent, unless the mother be quick with child, is not an indictable offence at the common law, and consequently . . . the mere attempt to commit the act is not indictable."

Following hard upon this decision, New Jersey passed the abortion statute.

In State v. Murphy,[110] the first case to interpret the 1849 statute, the court stated:

"The design of the statute was not to prevent the procuring of abortions, so much as to guard the health and life of the mother against the consequences of such attempts.

\* \* \* \* \* \*

"The offence of third persons, under the statute, is mainly against her life and health. The statute regards her as the victim of crime, not as the criminal; as the object of protection, rather than of punishment."

Twenty-three years later the court, in State v. Gedicke, [111] cited the above-quot-

---

108. 377 U.S. 288, 307–308, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).

109. 22 N.J.L. 52, 58 (Sup.Ct.1849). At the foot of the opinion the Reporter noted, "This decision induced the legislature to amend the criminal code, so as to make the offence in question a crime." 22 N.J.L. at 58.

110. 27 N.J.L. 112, 114–115 (Sup.Ct.1858).

111. 43 N.J.L. 86, 96 (Sup.Ct.1881).

ed language with approval and could still note that abortion "in almost every case endangers the life and health of the woman . . .."

However appropriate considerations of health and safety were in 1849 or 1881, they no longer constitute compelling grounds to justify a restrictive statutory scheme in this area. Today it is universally recognized that complicated surgery poses far less threat to the life and health of the patient than did much simpler operations over one hundred years ago. Today it is authoritatively said that abortion in the first trimester of pregnancy is almost seven times safer than carrying the pregnancy to term.[112]

Moreover, the consequence of restrictive abortion legislation is to produce an increased threat to the health, safety and lives of women. It is a matter of common knowledge that if women cannot obtain abortions from licensed physicians in hospitals or clinics, many subject themselves to the notorious "back-street" abortion or attempt self-abortion, both fraught with the myriad possibilities of mutilation, infection, sterility and death.

■ In such circumstances, we are not persuaded that there is a compelling state interest in safeguarding the health, safety and lives of its female citizens through the New Jersey abortion statutes.

■ Nor are considerations involving the control of sexual behavior or population growth sufficient to justify the prohibitory abortion laws. The question here is not whether state regulation in this area is reasonable, but whether restrictive abortion legislation is so compellingly related to achieving the desired goal that interference with a woman's right of privacy is permissible.

The State has already implemented its power to regulate sexual behavior by the enactment of statutes providing criminal sanctions for engaging in the primary activity sought to be regulated, fornication and adultery.[113]

■ As to the interest of the State in fostering population growth, no substantial let alone compelling reason has been advanced that could override the private right of a woman to seek an abortion early in pregnancy, especially in a densely populated and heavily urbanized state like New Jersey, with its attendant demographic, economic, sociological and ecological problems. Hence, these contentions must also fail.

Finally, we reach the assertion of the Attorney General and *amici* that the State has a compelling interest in preserving the life of the embryo or fetus which justifies the prohibitive abortion legislation. This contention invites judicial resolution of substantial questions of medical, philosophic and religious dimensions as to whether an embryo or fetus is a human being from the moment of conception. Numerous articles, many written by authorities in these fields, have been submitted to us purporting to conclusively settle the multitude of issues raised by this question. As stated by Justice Douglas in United States v. Vuitch: [114]

"Abortion statutes deal with conduct which is heavily weighted with

---

112. Tietze, *Mortality with Contraception and Induced Abortion*, 45 Studies in Family Planning 6 (1969) :
 "*Maternal Mortality* from complications of, or associated with, pregnancy, childbirth, and the puerperium, *excluding induced abortion: 20 deaths per 100,000 pregnancies*. This rate corresponds to the current level of maternal mortality in the white population in the United States. Official statistics of maternal mortality in the United States are based only on deaths attributed to complications of pregnancy, childbirth, and the puerperium. Thus defined, the

rate of maternal mortality, excluding abortion, was 18 per 100,000 live births in 1964–66.
 \* \* \* \* \*
 "*Mortality* associated with *legal abortions* performed in hospital, at an early stage of gestation : *3 deaths per 100,000 abortions*, based on current statistics from eastern Europe . . . .." (Emphasis in original.)

113. N.J.Stat.Ann. 2A :88–1 (Adultery) and 2A :110–1 (Fornication).

114. 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed. 2d 601 (1971).

religious teachings and ethical concepts.[1] Mr. Justice Jackson once spoke of the 'treacherous grounds we tread when we undertake to translate ethical concepts into legal ones, case by case.' Jordan v. De George, 341 U.S. 223, 242 [71 S.Ct. 703, 713, 95 L.Ed. 886] (dissenting opinion)."

"1. 'There remains the moral issue of abortion as murder. We submit that this is insoluble, a matter of religious philosophy and religious principle and not a matter of fact. We suggest that those who believe abortion is murder need not avail themselves of it. On the other hand, we do not believe that such conviction should limit the freedom of those not bound by identical religious conviction. Although the moral issue hangs like a threatening cloud over any open *discussion of abortion, the moral issues are not all one-sided. The psychoanalyst Erik Erikson stated the other side well when he suggested that "The most deadly of all possible sins is the mutilation of a child's spirit." There can be nothing more destructive to a child's spirit than being unwanted, and there are few things more disruptive to a woman's spirit than being forced without love or need into motherhood.' The Right to Abortion: A Psychiatric View 218–219 (Group for the Advancement of Psychiatry, Vol. 7, Pub. No. 75, 1969)." [115]

We are constrained simply to conclude that the great conflict raised by this issue is beyond the competence of judicial resolution.

It is noteworthy here, however, that the New Jersey Legislature has not afforded the embryo or fetus the rights of a living person. It has never abrogated

the common law rule that self-abortion prior to quickening is not a criminal offense.[116] Until the recent decision holding the death penalty unconstitutional in New Jersey [117] a pregnant woman could be executed prior to quickening.[117a] Moreover, a wrongful death action for a stillborn fetus is not maintainable in New Jersey [118] and a fetus must be born alive to invoke the rights that have been statutorily created for its benefit.[119]

 In these circumstances we find ourselves persuaded by and in agreement with the language of the court in Babbitz v. McCann [120] that:

"Upon a balancing of the relevant interests, we hold that a woman's right to refuse to carry an embryo during the early months of pregnancy may not be invaded by the state without a more compelling public necessity than is reflected in the statute in question. When measured against the claimed 'rights' of an embryo of four months or less, we hold that the mother's right transcends that of such an embryo.

\* \* \* \* \* \*

"it is sufficient to conclude that the mother's interests are superior to that of an unquickened embryo, whether the embryo is mere protoplasm, as the plaintiff contends, or a human being . . .." [121]

Nothing that has been said herein precludes the state, under its police powers, from establishing reasonable standards

115. 402 U.S. at 78–79, 91 S.Ct. at 1302. *See* 402 U.S. 79 n. 2, 91 S.Ct. 1294 (dissenting in part).

116. In re Vince, 2 N.J. 443, 450, 67 A.2d 141 (1949) ; State v. Murphy, 27 N.J.L. 111, 114 (Sup.Ct.1858).

117. State v. Funicello, 60 N.J. 60, 286 A.2d 55 (1972).

117a. State v. Cooper, 22 N.J.L. 52, 57 (Sup.Ct.1849).

118. Graf v. Taggert, 43 N.J. 303, 204 A.2d 140 (1964). *See* the recent decision in

Chrisaforeorgis v. Brandenberg (Ct.App., Ill., Jan. 28, 1972), 279 N.E.2d 440, in which the court held that a 36-week-old fetus is not a person for the purpose of recovery under the Wrongful Death Act of Illinois.

119. Smith v. Brennan, 31 N.J. 353, 157 A.2d 497 (1960).

120. 310 F.Supp. 293 (E.D.Wis.1970), appeal dismissed, 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (1970).

121. *Id.* at 301.

of safety in the conditions under which abortion services may be rendered.[122]

## VI. CONCLUSION

*Young Women's Christian Association of Princeton, New Jersey, et al. v. Kugler, Civ. No. 264–70:*

■ The motion for summary judgment on the petition of plaintiff-physicians for declaratory relief that N.J.S.A. 2A:87–1 is unconstitutionally vague and that N.J.S.A. 2A:87–1 and 45:9–16 violate plaintiff-physicians' and their women patients' right to privacy in the physician-patient relationship is granted;

The prayer for injunctive relief is denied;

The prayers of plaintiff-physicians Sherwin H. Raymond, M.D., and Ralph Dean Cavalli, M.D., for expungment of their criminal records resulting from convictions under the New Jersey abortion statute, and the return of their medical licenses, verging as they do on injunctive relief, are denied.

The motion of the Attorney General to dismiss the complaint is denied as to plaintiff-physicians and granted as to all other plaintiffs.

*Abramowitz, et al. v. Kugler, et al., Civ. No. 431–70:*

The motion of the Attorney General to dismiss the complaint is granted.

Each party shall bear its own costs. Plaintiffs in Young Women's Christian Association of Princeton, New Jersey, et al. v. Kugler shall submit an appropriate order on notice to the other parties.

GARTH, District Judge (concurring in part, dissenting in part):

I concur with the majority with respect to Points I (Standing), II (Ab-

stention) and III (Injunction). However, I disagree with the conclusion reached in the majority opinion with respect to Point IV (Vagueness) and Point V (Right of Privacy).

The United States Supreme Court in United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971) in reversing the trial court, held that the abortion statute of the District of Columbia[1] which contains the phrase, "necessary for the preservation of the mother's life or health" was not unconstitutionally vague.

While it is true that the New Jersey statute speaks in terms of "without lawful justification", and to that extent differs from the District of Columbia statute, the Supreme Court of New Jersey has held that the saving or preservation of the mother's life constitutes lawful justification. State v. Brandenburg, 137 N.J.L. 124, 58 A.2d 709 (1948). The New Jersey abortion statute does not outlaw all abortions, but only those which are not necessary to preserve the mother's life. This is virtually the same statutory language upheld as constitutional in Vuitch. See also: dissenting opinion, State v. Barquet, 262 So.2d 431 (Sup.Ct.Fla.1972).

It is argued by the majority that the differing views of the members of the New Jersey Supreme Court as expressed in its subsequent opinions may leave room for a broader definition of the term "[un]lawful justification" and that ". . . in some other case where the facts required it, . . . [the Supreme Court of New Jersey] might be called upon to determine the specific limits of the statutory exception for abortions performed with lawful justification . . .". State v. Moretti, 52

---

122. As in other states where abortion is permitted, e. g., N.Y. Penal Law § 125.05 (3) (McKinney Supp. 1970), amending § 105.05(3) (McKinney 1967).

1. D.C.Code Ann. § 22–201: "Whoever, by means of any instrument, medicine, drug or other means whatever, procures or produces, or attempts to procure or produce an abortion or miscarriage on any woman, unless the same were done as *necessary for the preservation of the mother's life or health* and under the direction of a competent licensed practitioner of medicine, shall be imprisoned in the penitentiary not less than one year or not more than ten years . . . .". [Emphasis supplied.]

N.J. 182, 192, 244 A.2d 499, 505 (1968). In my view however, this latter expression does not detract from nor dilute the status of the law of New Jersey as it exists today, which equates "lawful justification" with "preservation of the mother's life". Whether or not there are other circumstances which might in time cause a re-definition or expansion of "lawful justification" should not concern us in our instant task. Suffice it to say, if New Jersey's law, as interpreted by its highest court, is to the effect that only one exception exists for the commission of an abortion, then it is to that statutory concept, as so defined, that this court should address itself.

As Mr. Justice White stated in his concurring opinion in *Vuitch* (402 U.S. at 73, 91 S.Ct. at 1300, 28 L.Ed.2d at 601):

> "The District Court's holding that the District of Columbia statute is unconstitutionally vague on its face because it proscribes all abortions except those necessary for the preservation of the mother's life or health was a judgment that the average person could not understand which abortions were permitted and which were prohibited. But surely the statute puts everyone on adequate notice that the health of the mother, whatever that phrase means, was the governing standard. It should also be absolutely clear that a doctor is not free to perform abortions on request without considering whether the patient's health required it. No one of average intelligence could believe that under this statute abortions not dictated by health considerations are legal."

Having found no distinguishing characteristic between the New Jersey abortion statute as interpreted by the Supreme Court of New Jersey, and the statute held constitutionally definite by the United States Supreme Court in *Vuitch, supra,* which latter decision must control our decision here, I must respectfully dissent from the conclusion reached by the majority. This, of course, is not to say that I would have reached the same result, absent the *Vuitch* pronouncement.

With respect to Point V of the majority opinion (Right of Privacy), I agree generally that there is a fundamental right in a married woman to determine whether or not to bear a child, once conception has occurred. I reach that conclusion by an analysis that differs somewhat from the analysis projected in the majority opinion. As I see it, one must distinguish between the two lines of precedents which form the basis for the argument advanced by the plaintiffs to the effect that the New Jersey abortion statutes[2] violate their fundamental rights of marital and family privacy. The one precedential line is represented by Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (fundamental right of *marital* privacy); the other precedential line leads to a fundamental right of *family* privacy through the teachings of Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

The case of Griswold v. Connecticut, *supra,* has been relied upon in large part to support the contention that a woman has the fundamental right not to bear a child. I do not agree that *Griswold* is authority for that proposition. *Griswold* held that a state statute prohibiting the use of contraceptives violated the right of marital privacy. In the *Griswold* majority opinion, Mr. Justice Douglas maintained that this right, while not set forth specifically in any one amendment, was included within the

---

2. N.J.S.
 2A:87-1
 2A:87-2

2A: 170-76
45: 9-16
45: 10-9

penumbra of guarantees of the Bill of Rights. As Mr. Justice Douglas explained:

"... [The] specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance [citation omitted]. Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one. . . . The Third Amendment in its prohibition against the quartering of soldiers 'in any house' in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'" 381 U.S. at 484, 85 S.Ct. at 1681.[3]

In a concurring opinion, Mr. Justice Goldberg, joined by Mr. Chief Justice Warren and Mr. Justice Brennan, affirmed the reasoning embodied in the majority opinion, but emphasized the conceptual relevance of the Ninth Amendment. The opinion noted that the language and history of the Ninth Amendment indicate that "the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments." [4]

The obvious question is whether the right of marital privacy recognized in *Griswold* is broad enough to encompass the right of a married woman to have an abortion. The Supreme Court found in *Griswold* that a statute forbidding the use of contraceptives had a "maximum destructive impact" [5] upon the marital relationship. The use of contraceptive devices, therefore, was left to the discretion of married couples. The *Griswold* opinion implicitly recognizes that married couples have a right to regulate the size of their families prior to conception. Is there a valid reason why this right should not be extended to the post-conception situation as well? This question was raised by Mr. Justice Clark:

"... abortion falls within that sensitive area of privacy—the marital relation. One of the basic values of this privacy is birth control, as evidenced by the Griswold decision. Griswold's act was to prevent formation of the fetus. This, the Court found, was constitutionally protected. If an individual may prevent conception, why can he not nullify that conception when prevention has failed?" [6]

I maintain that the language in *Griswold* does not lend itself to such an expansive reading. I am mindful of the varied and broad readings given to *Griswold* by other courts. *See,* e. g., Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill.1971); Doe v. Bolton, 319 F.Supp. 1048 (N.D. Georgia 1970), appeal docketed, No. 971, 39 U.S.L.W. 3227 (U.S. Nov. 14, 1970); Roe v. Wade, 314 F.Supp. 1217 (N.D. Texas 1970), appeal docketed, No. 808, 39 U.S.L.W. 3229 (U.S. Oct. 6, 1970); Babbitz v. McCann, 310 F.Supp. 293 (E.D. Wisc.1970), appeal dismissed, 400 U.S. 1, 91 S.Ct. 12, 27 L.Ed.2d 1 (U.S. Oct. 12, 1970), appeal docketed, No. 297, 39

---

3. Mr. Justice Stewart dissented on the ground that there was nothing in these amendments which gave the Court authority to invalidate the Connecticut law.

4. Griswold v. Connecticut, *supra,* at 488, 85 S.Ct. at 1684.

5. *Id.* at 485, 85 S.Ct. 1678.

6. Clark, *Religion, Morality, and Abortion: A Constitutional Appraisal,* 2 LOYOLA L.REV. 1 (1969).

U.S.L.W. 3362 (U.S. Feb. 16, 1971); People v. Belous, 71 Cal.2d 954, 80 Cal. Rptr. 354, 458 P.2d 194, cert. denied, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970); *But see* Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C.1971); Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970); and Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D.La.1970), appeal docketed, No. 1010, 39 U.S.L.W. 3302 (U.S. Nov. 27, 1970). I cannot agree with the sweeping generalizations which seek to expand the *Griswold* factual context and holding beyond recognition. In *Griswold,* the majority focused on the sanctity of the marital home and the privacies of married life. The Court struck down an anti-contraceptive statute because it permitted the state to intrude upon "the sacred precincts of marital bedrooms." [7] The Court observed:

> "We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions. This law, however, operates directly on *an intimate relation of husband and wife. . .*" [8] [Emphasis supplied.]

The import of the *Griswold* decision is that private, consensual, marital relations are protected from unwarranted state regulation. Cotner v. Henry, 394 F.2d 873 (7th Cir. 1968); See also Baird v. Eisenstadt, 429 F.2d 1398 (1st. Cir. 1970); Mindel v. United States Civil Service Commission, 312 F.Supp. 485 (N.D.Cal.1970). But there is no discussion in *Griswold* of a "fundamental right" which can be exercised outside of the marital bedroom, weeks or

months after a child is conceived. I would therefore hold that the right of marital privacy, as defined in *Griswold,* is not broad enough to encompass the right of a married woman to determine whether or not to bear a child once conception has occurred.

This analysis, however, does not stop with *Griswold.* While I have declined to stretch *Griswold* beyond its logical reach, I am aware that other expressions of the Supreme Court may be read as leading to the fundamental right asserted by plaintiffs. This right, if found, however, has its genesis in a *family* privacy context rather than in the *Griswold* context. The Supreme Court has previously established the principle that the states may not make unwarranted inroads into areas of personal or family autonomy. Thus, in Loving v. Virginia, *supra,* the Supreme Court noted that "the freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." [9] See also United States v. Nation, 9 USCMA 724, 26 CMR 504 (1958).

In Skinner v. Oklahoma, *supra,* the Supreme Court struck down a state statute providing for the sterilization of "habitual criminals." The Court observed that it was dealing "with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race." [10]

The Supreme Court has also acknowledged the existence of certain fundamental rights associated with the family, Pierce v. Society of Sisters, *supra,* and Meyer v. Nebraska, *supra.* In

---

7. Griswold v. Connecticut, *supra,* 381 U.S. at 485, 85 S.Ct. at 1682.

8. *Id.* at 482, 85 S.Ct. at 1680.

9. 388 U.S. at 12, 87 S.Ct. at 1824. The Court held that a Virginia anti-miscegenation statute violated the Equal Protection and Due Process clauses of the Fourteenth Amendment. The opinion was not based solely on recognition of vital personal rights. The presence of invidious racial discrimination was also a

factor. As the Court stated, "To deny this fundamental freedom [marriage] on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive to the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all of the State's citizens of liberty without due process of law." 388 U.S. at 12, 87 S.Ct. at 1824.

10. Skinner v. Oklahoma, *supra,* 316 U.S. at 541, 62 S.Ct. at 1113.

*Pierce* the Court reviewed an Oregon statute which required parents to send their children to public schools. The statute, in effect, prevented parents from enrolling their children in private schools or academies. The Court concluded that the act "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." [11] The same principle was stressed in *Meyer, supra,* where the Court invalidated a state law prohibiting the teaching of foreign languages to children who had not passed the eighth grade. The Court maintained that the word "liberty" in the Due Process Clause included the freedom "to marry, establish a home and bring up children." [12]

The standard that emerges from these cases is clear. A fundamental right is protected by the Constitution unless the state has a compelling interest which outweighs this right. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Griswold v. Connecticut, *supra.* [13] This standard requires a two-step operation: the court must first determine whether the right asserted by the individual is a *fundamental right*; if the court answers this question in the affirmative, it must then decide whether there is a compelling state interest which outweighs this right.

I emphasize that the fundamental rights doctrine is not designed to open the door to the subjective views of individual judges. The courts are directed to recognize only those rights which are rooted in the "traditions and [collective] conscience of our people." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934); Griswold v. Connecticut, 381 U.S. at 493, 85 S.Ct. at 1686.

Certainly, the fundamental rights heretofore recognized by the Supreme Court have roots in our culture and traditions. The right to marry [14] and the right to procreate [15] are not the products of popular movements. They are threads woven into the fabric of our society. And the right of parents to make determinations about their children's education or religious training [16] is basic to the family structure. These are rights which are firmly established. The right to travel, recognized by the Supreme Court in United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) is not the product of judicial whim. Its roots antedate the Constitution. [17] The right of private association, also sustained by the Supreme Court, [18] is fundamental to our democratic society.

Mr. Justice Holmes repeatedly criticized a subjective, fundamental rights approach to Constitutional doctrine. In

11. Pierce v. Society of Sisters, 268 U.S. at 534, 535, 45 S.Ct. at 573.

12. Meyer v. Nebraska, 262 U.S. at 399, 43 S.Ct. at 626.

13. Where fundamental rights are involved, the courts do not utilize the "rational regulation" standard. It is not sufficient, therefore, to maintain that the state has a rational or reasonable purpose for its policy. As Mr. Justice Goldberg said in Griswold: "In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. 'Where

there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.'" [citation omitted] 381 U.S. at 497, 85 S.Ct. at 1688.

14. Loving v. Virginia, *supra.*

15. Skinner v. Oklahoma, *supra.*

16. Pierce v. Society of Sisters, *supra;* Meyer v. Nebraska, *supra.*

17. The Constitution does not mention a "right to travel," but the Articles of Confederation provided for free ingress and egress to and from any state. Art. IV, Articles of Confederation.

18. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

a series of dissenting opinions,[19] he maintained that a court should not read into the Constitution conceptions of public policy which the court happened to entertain.[20] The Holmesian view has won wide acceptance, and the states are now granted wide latitude to experiment with social and economic programs.

However, this grant does not permit the state to experiment with basic rights, rooted in our culture and *traditions*. As Mr. Justice Goldberg said in Pointer v. Texas, 380 U.S. 400, 413, 85 S.Ct. 1065, 1073, 13 L.Ed.2d 923 (1965), ". . . I quite agree with Mr. Justice Brandeis that . . . 'a . . . State may . . . serve as a laboratory; and try novel social and economic experiments' . . . . I do not believe that this includes the power to experiment with the fundamental liberties of citizens . . . ." The Supreme Court has since reaffirmed its desire to protect personal and family rights which are based on more than contemporary social or economic viewpoints. See Loving v. Virginia, *supra*; Shapiro v. Thompson, *supra*.

The right of family privacy lies at the base of our social and cultural institutions. The Supreme Court has recognized the right to establish a home and bring up children in *Pierce, supra*, and *Meyer, supra*. These decisions "have respected the private realm of family life which the state cannot en-

ter." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944).

If I am correct in my reading of these precedents and of their teachings, then it would appear that the right of family life or privacy which lies at the base of our social, traditional and cultural institutions, must of necessity result in a concomitant fundamental right of a married couple to determine the scope, dimension and extent of their family unit. While it is true that no direct authority has extended the family privacy concept to this point, I feel that it is a logical extension of the Supreme Court pronouncements in this area.

I do not see how recognition can be given to the rights previously accorded to home establishment, rearing and education of children, without acknowledging the impressive sociological, economic and educational effect that family size has upon these considerations. A decision to bear a child hence to add to the family unit, inevitably affects all facets of family life and each and every member of the family.

If, as discussed, there exist fundamental rights pertaining to family life and privacy, I can find no basis nor reason for restricting those rights in this most vital and threshold aspect. Accordingly, I would hold that, subject to state interest, there is a fundamental right in a married woman [21] to deter-

---

19. *See* Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718 (1927); Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923); Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915); Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

20. Judge Learned Hand was also an opponent of this doctrine. He once stated: "For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not." HAND, THE BILL OF RIGHTS 73 (1958).

21. While my conclusion has been framed in terms of married women as distinct

from single women, the thrust of the plaintiffs' argument is that this fundamental right is possessed by all women, married and single.

The fundamental right which I have found stems from Pierce and Meyer, which establish a right of family privacy. The force of precedent and this analysis necessarily restricts this right to married women.

I recognize, however, that the New Jersey abortion statutes make no distinction between married and unmarried women. Thus, in the absence of a compelling state interest (but see discussion infra), I would be obliged to hold these statutes overbroad and therefore unconstitutional. See NAACP v. Alabama, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964);

mine whether or not to bear a child (thereby adding to the family unit or not, as the case may be) once conception has occurred.

I therefore reach the same conclusion as the majority, but predicated upon a "family right" analysis rather than on an analysis which would expand *Griswold* to what I regard would be impermissible limits. That distinction, of course, would restrict to some extent the scope of the fundamental right which I would recognize. It is with respect to the latter half of the equation (the nature and extent of the state interest necessary to justify an invasion of this fundamental right, Corkey v. Edwards, *supra*,) that I part company with the majority.

Certainly, the courts have been watchful to prevent unwarranted intrusions upon fundamental personal liberties. But even First Amendment rights are not considered absolute.[22] This point is illustrated in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), which held that a clan or colony may not permit polygamy even though this practice accords with the religious beliefs of its members. The religious practice [23] reviewed in *Reynolds* was in no way frivolous. It was clear that the members of the Church of Jesus Christ of Latter-Day Saints believed that failure or refusal to practice polygamy would result in "damnation in the life to come."[24] But fundamental personal liberties must give way where there are compelling state interests. The Supreme Court touched upon this problem in *Reynolds* when it asked:

"Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile [sic] of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?"[25]

I hold that the state has such a compelling interest in the preservation of life, including fetal life,[26] that even the fundamental right which I have acknowledged must be subordinated to that state interest.[27]

It must be remembered that the fundamental right with which we are here concerned can only be exercised by destroying potential life. See Corkey v. Edwards, *supra*. The interests of family privacy or convenience no matter how forcefully argued and no matter how vital, cannot be elevated over the right to live. As one Court has ob-

---

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

22. I cite Mr. Justice Holmes' maxim: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).
 Other cases in the First Amendment area illustrate this point. A farmer may be forced to comply with Federal agricultural quotas even though he feels that they are contrary to the teachings of the Holy Scriptures. United States v. Kissinger, 250 F.2d 940 (3rd Cir.), cert. denied, 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066 (1958). An individual may be precluded from using poisonous snakes in a religious ritual, State v. Massey, 229 N.C. 734, 51 S.E.2d 179, appeal dismissed for want of a substantial Federal question, *sub nom.* Bunn v. North Carolina, 336 U.S. 942, 69 S.Ct. 813, 93 L.Ed. 1099 (1949).

23. The Free Exercise clause is absolute in its protection of religious beliefs, but it does not serve as an absolute bar to state regulation of religious practices.

24. Reynolds, 98 U.S. at 161.

25. Reynolds, 98 U.S. at 166.

26. I include in the term "fetal life" all potential life as it may exist from the moment of conception.

27. There are other possible state interests which might be asserted: population control, health and public safety and regulation of sexual conduct. My holding makes it unnecessary to determine the significance of these interests.

served, "Protection of life has traditionally been one of the first duties owed by a state to its people.[28] "

Even in the first few weeks of pregnancy, the embryo [29] shows unmistakable signs of life. I realize that some courts have found it helpful to use terms such as "quickening" or "trimester" in evaluating fetal rights. See Babbitz v. McCann, *supra*; Doe v. Scott, *supra*. Older cases generally used the words "quickening" and "viability" to chart fetal development. According to Black's Law Dictionary, "quickening" is the first motion of the fetus which is felt by the mother. Quickening occurs in the middle of the term of pregnancy, usually in the last part of the fifth month. But the moment of quickening varies with each woman, and this makes it an unreliable measuring device. An unborn child is said to be "viable" when it is capable of existence apart from its mother.[30] Viability also does not occur on a fixed date. In fact, advances in medical technology keep pushing the date of viability further back into the early months of pregnancy.

I do not find these concepts helpful in adjudicating the competing interests of the mother and the fetus. In fact, I fail to see how sound constitutional doctrine can be based on artificial timelines. I view fetal life as a continuous growth process without the qualitative changes suggested by terms such as quickening or viability.

I do not imply that fetal life is equivalent in every sense to "human life." I maintain only that the state's interest in

preserving fetal life outweighs the interest of the mother and the family unit. This view is consistent with the policy expressed in three decisions by the New Jersey Supreme Court. In Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 42 N.J. 421, 201 A.2d 537, cert. denied, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964), a pregnant woman refused, on religious grounds, to submit to a blood transfusion. There was sufficient evidence to indicate that at some point in the pregnancy she would hemorrhage severely and that both she and the unborn child would die unless a blood transfusion was administered. Finding some support in previous cases, the court held:

> "We are satisfied that the unborn child is entitled to the law's protection and that an appropriate order should be made to insure blood transfusions to the mother in the event that they are necessary in the opinion of the physician in charge at the time." [31]

A similar conflict was raised in Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967), when plaintiff-family, brought a malpractice action against doctors who allegedly failed to inform them that their child could be defective when born. Plaintiffs maintained that the failure to give the warning prevented the woman from procuring an abortion.

In affirming the dismissal of the complaint, the court observed:

> "The right to life is inalienable in our society . . . .
>
> We are not faced here with the necessity of balancing the mother's life

28. Commonwealth v. Brunelle, No. 83879, at 5 (Middlesex County, Mass.Super.Ct. 1970).

29. Fetal life may be subdivided into various stages: the zygote, the embryo, and the fetus. According to DORLAND'S ILLUSTRATED MEDICAL DICTIONARY a zygote is "the cell resulting from the fusion of two gametes; the fertilized ovum. Dorland's defines embryo as "the early or developing state of an organism, especially the developing product of fertilization of an egg. In the human, the embryo is gen-

erally considered to be the developing organism from one week after conception to the end of the second month." The same source defines a fetus as "the developing young in the human uterus after the end of the second month."

30. See Woods v. Lancet, 303 N.Y. 349, 357, 102 N.E.2d 691. 695 (1951).

31. Raleigh, 42 N.J. at 423, 201 A.2d at 538. The court noted that at the time of the action "the child was quick" since the pregnancy was beyond the thirty-second week.

against that of her child . . . . Eugenic considerations are not controlling. We are not talking here about the breeding of prize cattle. It may have been easier for the mother and less expensive for the father to have terminated the life of their child while he was an embryo, but these alleged detriments cannot stand against the preciousness of the single human life to support a remedy in tort. [citations omitted].

Though we sympathize with the unfortunate situation in which these parents find themselves, we firmly believe the right of their child to live is greater than and precludes their right not to endure emotional and financial injury." [32]

The New Jersey Supreme Court reaffirmed its interest in preserving life in John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 279 A.2d 670 (1971). In that case, Dolores Heston, a twenty-two year old Jehovah's Witness was injured severely in an automobile accident. For religious reasons, Miss Heston's mother insisted that a blood transfusion not be administered and signed a release of liability for the hospital and medical personnel. The hospital then made application to a state court judge for the appointment of a guardian for Miss Heston. After a hearing, the court appointed a guardian with authority to consent to blood transfusions. Surgery was performed at the hospital and blood was administered. Following the operation, the defendants moved to vacate the order, but the court declined to grant the motion.

On appeal the Supreme Court of New Jersey held that there was no constitutional right to choose to die. The court found that "the interest of the hospital and its staff, as well as the State's interest in life, warranted the transfusion of blood under the circumstances of this case." [33]

As I have previously made evident, "the State's interest in life" is not con-

fined or restricted to that "life" after birth. The State's interest in protecting and preserving life as I view it commences at the moment of conception. "Whatever that entity is, the state has chosen to protect its very existence. . ." Corkey v. Edwards, supra, 322 F.Supp. at 1253. In this respect I am in agreement with the rationale of Corkey v. Edwards, supra, and with the dissent of Judge Campbell in Doe v. Scott, supra.

Whatever may be the merits of the sociological, economic and moral arguments advanced by the plaintiffs as a basis for our holding otherwise, it would appear to me that these arguments and the data supporting them are more appropriate for a legislative rather than for a judicial forum.

Accordingly, I must respectfully dissent from the conclusions reached by the majority of this Court. I would hold the New Jersey abortion statute to be constitutional for the reasons hereinabove expressed.

---

32. Gleitman v. Cosgrove, *supra*, 49 N.J. at 30, 31, 277 A.2d at 693.

33. John F. Kennedy Memorial Hosp. v. Heston, *supra*, 279 A.2d at page 674.